Sealed



FILED by_____ D.C.

JAN 1 2 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

16-20155

UNITED STATES OF AMERIICA
Ex rel. and ELROY A. KALME,

CIV-UNGARO

     Relator,

**FILED  UNDER  SEAL**

     vs.

LARKIN COMMUNITY HOSPITAL, INC.,
a Florida Corporation,

     Defendant.

_____/

### QUI TAM RELATOR'S COMPLAINT

1.     This is an action which arises under the False Claims Act, 31 U.S.C §§ 3729-33.

2.     Jurisdiction is founded on 28 §§ U.S.C. 1331, 1345 and 31 U.S.C. § 3372.

3.     KALME was and is a resident of Miami-Dade County, Florida and has been at all times relevant to this Complaint.

4.     LARKIN is a Florida corporation that transacts business in Miami-Dade County, Florida.

5.     This Court has personal jurisdiction over LARKIN as LARKIN is located, can be found in, and continues to transact business in the Southern District of Florida. Additionally, LARKIN made, used or caused to be made or used false records in this

district to get false or fraudulent claims paid or approved by the United States government.

6.      Pursuant to 31 U.S.C. § 3730 (b)(2), a copy of the Complaint and written disclosure of substantially all the material evidence and information in KALME's possession has or will be served on the United States Attorney for the Southern District of Florida simultaneously with the instant Complaint.

## VENUE

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732 (a) because LARKIN can be found in and has transacted business relating to this matter in the Southern District of Florida and the claim arose in the Southern District of Florida.

8.      Because of the acts committed against the people of the United States, KALME has obtained the legal services of the undersigned counsel to protect and secure his legal rights for all allegations and claims raised in this matter and has agreed to pay a reasonable fee for services.

## FACTS

9.      LARKIN is in the business of providing hospital care and other medical services to members of the public in the South Florida area.

10.     LARKIN has a facility in the South Florida area.

11.     LARKIN is compensated by the Federal government's Medicare and Medicaid programs.

12.     The majority of LARKIN's patients are Medicare patients.

13.     The Relator, Elroy A. Kalme, was a Podiatric Physician who worked for LARKIN starting in 1997.  In 1998 KALME founded the Larkin Community Hospital Podiatry Residency Program.  KALME also served as the Medical Director of the Podiatry Department, Podiatric Medicine & Surgery Residency Program Director, Assistant Director of Podiatric Medical Education, member of the Medical Executive Committee, and also the Director of Research Education, Director of Externships, Residency Program Coordinator, and Podiatric Clinical Education Professor at LARKIN.

14.     LARKIN terminated KALME on January 9, 2012.

15.     During KALME's tenure as a podiatric physician for LARKIN from April 1997 through on or about January 9, 2012, he repeatedly observed violations of the law pertaining to Medicare and Medicaid billing.

16.     Many of the medical professionals and individuals who work at LARKIN's facilities, acting on behalf of LARKIN, overcharged the United States government for Medicare and Medicaid patients.

17.     In 2010, LARKIN's President, Chief Executive Officer, and Chairman of the board, Dr. Jack J. Michel, selected a new Chief Executive Officer, Sandra Sosa-Guerrero.

18.     In 1997 Congress established Evaluation and Management Coding (E/M Coding) guidelines for documenting medical treatment associated with Medicare and Medicaid patients in addition to private patient analysis.  LARKIN was obligated to follow these guidelines in order to seek and obtain compensation for Medicare and Medicaid patients.

19.     In 2010, KALME was the head of the Podiatry Department and of the podiatry residents' program at LARKIN. On June 23, 2010 a group of second-year podiatry residents met with KALME and informed him (KALME) that Physician # 1 was filing false claims to Medicare and Medicaid since patient encounters were only taking place by the first-year podiatry resident who were also completing all initial consult note documentation and follow-up progress notes documentation for Physician # 1.   The residents told KALME that Physician # 1 altered patient records to falsely reflect that the notes prepared by the residents were entered into the record by Physician # 1.   The residents were concerned about being implicated in a Medicare fraud scheme and demanded that they not be involved with treating patients under Physician # 1.

20.     After investigating the matter, KALME confirmed that LARKIN's physicians, such as Physician # 1, defrauded the government by having residents not authorized or qualified to complete Initial consultation notes or progress notes and other information entered into patient notes in the charts and then claim them as his own. Physician # 1 often crossed out the title of patient notes prepared by a resident and then wrote over the notes to make it appear that they were his own.   Physician # 1 sometimes made these entries weeks or even months after a patient had been seen by a resident.

21.     On August 16, 2010 during a podiatry meeting lecture, a first-year podiatry resident told KALME that Physician # 1, offered podiatry residents various gifts in exchange for providing a supply of patients that could undergo application of grafts to their lower extremity wounds into the Operating Room from the assisted living facilities and nursing home population who needed surgery to LARKIN while admitted at Larkin. The gifts included cash, food, and bar outings from the representative from the Xenograft

Company that was supplying the gifts.  The resident told  KALME that the offer had been made to another doctor as well.  The resident also told  KALME that Physician # 1 was not writing his own attending physician medical notes on all patients, including Medicare patients, and was billing Medicare for services not rendered.  Dr. McCoy told KALME that these actions were being taken by Physician # 1 to ensure that a high volume of patients would be maintained.

22.     On August 17, 2010  KALME advised LARKIN's Chairman, Dr. Jack J. Michel, of the concerns about Physician # 1 expressed by the podiatry residents as well as concerns that Physician # 1's actions were contrary to CMS federal guidelines and guidelines under the Council on Podiatric Medical Education rules and regulations for Graduate Medical Education.  Jack Michel requested that KALME investigate the matter and report back to him. Dr. Michel also told  KALME "do not call me on the phone to tell me about situations and problems that deal with the possibility of fraud or Medicare problems and don't send me any e-mails with stuff like this because you know the government can get into my hospital mail and listen to the conversations."

23.     As a result of his investigation, KALME discovered that LARKIN misused the medical transcription services of the Trans Dyne Corporation.  Doctors would call in to this system to dictate patient notes.  A number or identifying code was assigned to each patient note.

24.     LARKIN's physicians would often call in to the Trans Dyne system, obtain an identifying code, but then would not complete, or in some cases failed to provide any content whatsoever to a patient note.  One of LARKIN's directors would routinely call into the Trans Dyne system utilizing physician identification numbers,

obtain a medical note identifying code "job number" off the Trans Dyne system, then use the "job number" to identify a fraudulently generated medical note by his or her own self, using saved recycled notes off her own computer, then placed those notes in the patients' medical chart in order to knowingly bill Medicare and Medicaid for services never rendered by LARKIN's physicians. These notes were generated in order to provide the false impression that patients were being treated by a physician.

25. While reviewing the patients charts and evaluating his own medical notes, KALME noticed that his own progress notes, which he usually completed during the day but revised in the wee hours of the morning, had a time stamp that was nearly identical to the patient notes which were purportedly prepared by other doctors. However, KALME did not observe any of those doctors on duty treating patient or dictating notes at LARKIN at the same time reflected on the dictated medical notes.

26. KALME questioned Larkin's staff as to when these doctors had completed their patient notes. KALME asked a staff member about these physicians. The staff member told him "too many things were going on" and that he should stay out of the matter. The staff member also told KALME that Director # 1 was the one that dealt with those doctors and they supposedly came only very late at night." When asked to explain the comment, the staff member told KALME not to worry about it. KALME began to stay at LARKIN until 5:00 a.m. and did not see the doctors who had supposedly seen and prepared patient notes in the middle of the night. KALME asked several other staff members whether they had seen these doctors write patient notes the night before or in the wee hours and the answer was always "no."

27.     Over time, KALME noticed that a lay person would regularly go to LARKIN's Health Information Management (HIM) office at different times of the day, pick up files that appeared to be patient notes, and then leave.   After researching the matter, KALME determined that the car that the layperson arrived belonged to a doctor who worked at LARKIN.

28.     LARKIN's podiatry residents did not follow documentation guidelines as required under Medicare's Graduate Medical Education patient contact requirements in Teaching Hospitals by failing to generate their own patient treatment notes.  Instead, they would copy verbatim text from physicians' notes and other residents' rather than take to the time to visit the patient then preparing patients' notes for each patient that were specific to that particular patient.  The residents were not directly providing treatments, providing wound care, and were not having patient contact.

29.     LARKIN formed partnerships with various Assisted Living Facilities (ALF's) to assure that patients from certain ALFs were admitted to LARKIN for medical services even if they did not meet the criteria.  LARKIN did this by altering laboratory tests and adjusting the diagnoses in order to maintain the patient at the hospital.

30.     Several of LARKIN's doctors would alter diagnoses based on lab data available, using the highest paid DRG's at the time, to assure that patients would be admitted.   These patients were co-managed by the professional association of one of LARKIN's doctors.  Director # 1 would assure that patients from a few doctors had their diagnoses changed from a medical diagnoses to a psychiatric diagnoses in order to assure that the patients would be admitted after not meeting criteria in the Emergency Room to be admitted to the medical floors.

31.     LARKIN also billed Medicare for spinal implant materials that were never implanted and overcharged Medicare for facet fusion trays.

32.     LARKIN allowed podiatry residents to schedule patients for surgical procedures that were not medically necessary simply to bill Medicare. For example, LARKIN routinely billed Medicare for excisional debridements, amputations, resections of bone and other unnecessary or contra-indicated applications of grafts in order to overbill Medicare under the services of Physician # 1.

33.     LARKIN overbills the Medicare Graduate Medical Education program for Teaching Hospitals by falsely claiming one (1) Full Time Equivalent (FTE) on every resident to maximize "Medical Education" reimbursement under the Medicare annual cost report.

34.     LARKIN's Health Information Management office employees, under the direction and assistance of Kenia Mendoza, utilizing a systematic scheme, manually and electronically signed and sign deficient Medicare and Medicaid patient notes, orders, and documents records without the physicians' knowledge to achieve compliance with CMS requests for records during RAC and other reviews, AHCA inspections, and JCAHO accreditation surveys, and in order to defraud Medicare and bill for medical services that would otherwise not be reimbursed because of the deficiencies and hence prevent refund requests by CMS.

35.     LARKIN and Dr. Jack Michel under Larkin Imaging and Associates, LLC holds an improper relationship with Virtual Imaging Services, Inc. in which the improper information of ownership, financial or controlling interest has been deliberately

concealed in order to operate the Independent Diagnostic Testing Facility (IDTF) and be able to improperly bill Medicare, Medicaid, and other companies.

36.    LARKIN employs physicians and other medical or administrative professionals who charge or seek reimbursement from Medicare and Medicaid (on behalf of (LARKIN).

37.    From approximately 2010, LARKIN has systematically defrauded Medicare and Medicaid, most probably for a total of millions of dollars by claiming reimbursement for thousands of patients not directly treated by physicians for whom the proper medical transcription was not conducted, false notes were generated, or changing medical diagnoses to up-code and increase the DRG, overcharging for procedures that were not needed, or changing medical records to allow for patients who did not otherwise meet the criteria for admission to be admitted.

38.    LARKIN's actions were carried out solely to maximize profits illegally at the expense of the Medicare and Medicaid programs, and ultimately, the people of the United States and not for a medically justifiable purpose.


## COUNT I
### VIOLATION OF 31 U.S.C. § 3729
#### (FALSE OR FRAUDULENT CLAIMS MADE TO THE UNITED STATES GOVERNMENT FOR PAYMENT OR APPROVAL)

39.    From approximately 2010 and continuing through and including the present date, employees and/or agents acting on behalf of LARKIN, knowingly presented to an officer or employee of the United States government, via normal administrative

channels of the Medicare and Medicaid programs, numerous false or fraudulent claims for payment or approval; and/or knowingly made, used, or caused to be made or used, numerous false records or statements to get false or fraudulent claims paid or approved by the United States government; and/or conspired to defraud the United States government by getting false or fraudulent claims allowed or paid.

40.     In committing the acts and omissions averred in this Complaint, LARKIN violated the False Claims Act, 31 U.S.C. § 3729 (a)(1), by knowingly presenting or causing to be presented to an officer or employee of the United States government a false or fraudulent claim for payment or approval.

41.     In addition, LARKIN has violated the False Claims Act, 31 U.S.C. § 3729(a)(2) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States government.

42.     In addition, LARKIN has violated the False Claims Act 31 U.S.C. § 3729(a)(3), by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States government.

43.     To the extent, if any, that this case is deemed to be a related action and that facts set forth herein are deemed to the same as facts underlying an existing *qui tam* False Claims Act action pending at the time of filing this action, as prohibited by 31 U.S.C. § 3730(e)(3), then said factual allegations in common with the pending action, which would cause this to be a related cause of action, are hereby expressly excluded from this action, but only to the limited extent necessary to exclude such preemption.

44.    Further, to the extent that the allegations or transactions set forth herein are the subject of an existing civil suit or administrative civil money penalty proceeding in which the United States government is already a party, then the allegations or transactions referred to herein which are the subject of any civil suit or administrative civil money penalty proceeding are expressly excluded here from, but only for the specific time periods and specific allegations or transactions as necessary.

45.    Pursuant to 31 U.SC. § 3729(a), Defendant is liable to the United States government for a civil penalty of not less than $5,000 and not more than $10,000 for each violation of the False Claims Act, plus three (3) times the amount of damages which the United States sustains or fines LARKIN because of the acts of LARKIN.

WHEREFORE, on behalf of the United States, KALME demands judgment against LARKIN for a civil penalty of $10,000 per false claim, plus three (3) times the amount of damages that the United States government sustains because of LARKIN's acts, pursuant to 31 U.S.C. § 3729; reasonable expenses, attorney's fees and costs, and that this Honorable court deems necessarily incurred pursuant to 31 U.S.C. § 3730(d)(1)(2), and such other relief as may be deemed equitable and just under the circumstances.

## DEMAND FOR JURY TRIAL

KALME demands a trial by jury on all issues triable as a matter of right.

Respectfully submitted,

_____
Gary A Costales

Florida Bar No. 0948829

Law Office of
Gary A. Costales, P.A.
1200 Brickell Ave., Suite 1440
Miami, Florida 33131
(305) 375-9510 Ext. 314
(305) 375-9511 (facsimile)